## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                              Case No. 21-cr-20036

v.

                              Hon. Laurie J. Michelson

D-1 MARCELLUS WALLACE.

     Defendant.

---

### DEFENDANT MARCELLUS WALLACE'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE GUIDELINES

The legendary criminal defense attorney, Neil Fink, was a big believer in Hope Theory. Dr. Charles Snyder's Hope Theory teaches, among other things, that the driver of hope is individual's belief in their own ability to realize their dreams.[1] But hope can be elusive, especially for at-risk youth who often believe that they deserve the bad things in their lives. *See, generally, id.* A person devoid of hope, often experiencing the related feeling of being trapped, leads to depression.[2] In turn,

---

[1] Snyder, C (1994), *The Psychology of Hope, You Can Get Here from There,* Free Press, New York, New York.

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4689589/

depression and hopelessness directly correlate to dramatic increases in criminal tendencies and the lack of impulse control.[3]

Defendant Marcellus Wallace ("Wallace") endured a childhood devoid of hope. Impoverished, food insecure, ill, surrounded by violence, and without parents, Wallace's adolescence – a phase of life he is only just now completing – was traumatic. It is self-evident that his early life experiences led to bad decisions and criminal tendencies. Quite frankly, Wallace is lucky to be alive given the environment in which he lived.

But the trauma of his past is no longer his present and it is certainly not his future. Things are changing for the better. Thoreau wrote "we are constantly invited to be what we are."[4] To the government, who writes *ad nauseum* about Wallace essentially being irredeemable and only worthy of a prison cell, Wallace is a finished product. But he is far from it. He is an ever-changing, dynamic individual. He is filled with renewed hope and opportunity. His time as a teenager in prison, the additional time serving jail time in restrictive conditions, along with the birth of his nephew and the success of his brother, have substantially rehabilitated Wallace.

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4520382/

[4] https://archive.org/details/writingsofhenryd07thorrich/page/190/mode/2up?view=theater

Wallace is armed with a brand-new tool: hope. And he throws himself at the mercy of the Court to allow him these important years to grow and explore. For the reasons described herein, Wallace, through his lawyers, who have gotten to know Wallace and his family and have come to understand their life circumstances, urge the Court to temper justice with mercy, and, mindful of Wallace's adolescence and history and characteristics, sentence Wallace to time served, or no more than 36 months in total.[5] And while such a sentence requires a not insignificant departure and variance, Wallace will be the type of man we want to come out on the other side of the criminal justice system.

## Introduction and Background Information

Wallace is 25 years old. He grew up in an area of Detroit known for its drugs and unrelenting violence - Joy Road and Southfield Freeway. The area is notorious for danger. Wallace's mother, Latoya Perry, was in and out of prison since Wallace's birth. She started her longest prison term when Wallace was just 13 years old. When she was granted compassionate release in 2021, Wallace was already incarcerated for the current case. Wallace has not had meaningful, uninterrupted time together with his mother in over a decade. The same is true of his relationship with his father.

---

[5] At the time of sentencing, Wallace will have served 21 months, 7 days in federal custody. But he has served a total of 27 months and 22 days, in total, prior to his initial appearance in federal court by Writ. The initial Writ, issued in this case for April 9, 2021, was apparently ineffective, and Wallace spent additional months in state custody for unknown reasons. *See* PSR, ¶ 2.

Wallace's father, Terry Wallace, Sr., was murdered within months of his mother entering prison in 2012. Wallace lost his father and mother at age where a parent's influence is most important.

If that was not enough, prior to these tragic teenage years, at birth, Wallace suffered from an anorectal deformation. He could not defecate on his own and was forced to use a colostomy bag until he was about 11 years old. He was relentlessly mocked, teased, and bullied as a child. He still suffers medical consequences from this malformation due to improper care when he was younger.

Wallace's father murdered, his mother locked away in prison, with only his older brother, Terry Wallace, Jr., and grandmother to rely on, Wallace was an aimless teenager, wandering Warwick and Constance in Detroit with BB guns, surrounded by gang influence, drug dealers, and other dangers many would never understand. "We were hopeless," Wallace said to his brother from prison during filming of a documentary. It would continue to get worse, as in 2014, when Wallace was 16, his brother Terry was arrested and imprisoned. The walls continued to cave around this teenager.

Everything Wallace has known for virtually his whole life was crime, poverty, violence, and hopelessness. And even as this story starts to change for the better when his brother, fresh out of prison, took the hip hop music scene by storm, becoming legendary rapper Tee Grizzley, Wallace was not there to experience these

changed circumstances. Wallace remains close with his brother, and because Wallace was incarcerated virtually every day since he was 17 years old, he never went on a journey with his brother to escape his circumstances. In fact, when Wallace was paroled in October of 2020, he picked up this offense two months later, in December of 2020. His never been able to even get his footing, let alone climb a mountain.

### Renewed Hope for the Future

What makes rap star Tee Grizzley, Wallace's brother, so successful is his relatability to his audience. More than 53% of Detroiters live in "areas of concentrated poverty."[6] This is areas like Joy Road and Southfield Freeway, where some streets look like war zones and safety is never promised like it is in Bloomfield Hills or Birmingham. Having lived that life, and experienced everything that comes with it, Tee Grizzley has credibility with millions across the country who live similarly.

That is power. But at the same time it is tragic that so many live in those situations. For the Wallaces, the ability to communicate hope to so many who will listen is a purpose and reason enough to live a law-abiding, productive life. For one, the Wallace brothers have been given an escape route from their challenges. But

---

[6] https://detroitfuturecity.com/wp-content/uploads/2017/11/DFC_139-SQ-Mile_People.pdf

what's more is the Wallace brothers have an opportunity to help others feel hopeful. Sure, entertainment is a form of temporary escape in itself, but the Wallaces can do more with the attention of their audience – they can show young men across the country, by their example, that escape from life's tough circumstances is possible.

In pursuit of these goals, 300 Entertainment LLC, Tee Grizzley's record label, has been uniquely supportive. The label signed Defendant Marcellus Wallace to a record deal that will give him unparalleled opportunity upon release from incarceration. "Marcellus has a unique ability to turn his traumatic life experiences into artistic parables that give a voice to the voiceless." **Exhibit A**, Letter from Selim Bouab. And what undersigned counsel has come to learn in representing artists is that not all record labels are equal. 300 Entertainment means it when it says its "goal is to be a mentor to Marcellus, similar to how [it has] mentored his brother." *Id.* The label "remain[s] fully committed to use all of [its] respective resources in the music industry to increase Marcellus' visibility as an artist, storyteller, and positive leader in the community." **Exhibit B**, Letter from Rayna Bass.

Industry titan, Kevin Lites, former CEO of the famous Def Jam Records, and renowned philanthropist, writes to this Court that he is quite familiar with artists who "grew up in an environment with concentrated poverty and had an uphill battle to achieve upward economic mobility." **Exhibit C,** Letter from Kevin Lites. Lites has seen how "lives are changed when given the opportunity to have a successful music

career supported by a record label." *Id.* Lites writes: "I've personally seen individuals who, upon release from prison, create a new life for themselves and positively impact the lives of others through activism and philanthropy." *Id.* Having this experience and met many over his career in similar situations, Lites "firmly [believes] that with 300 Entertainment's assistance and the support of Mr. Wallace's family, he can rehabilitate his life and become a positive example for other young people who have gone similarly difficult paths." *Id.*

### The Guidelines

This Court is well aware that the guidelines are advisory and "reflect a rough approximation of sentences." *United States v. Rita,* 551 U.S. 338, 350 (2007). The Probation Department has concluded that Wallace's guideline range is 70 to 87 months. *See,* Pre-Sentence Investigation Report ("PSR"), ECF No. 39, at 20 (PageID.150). The parties anticipated less.

The Probation Department assigns a Base Offense Level of 22. *Id.* at PageID.141. To arrive at 22, the PSR concludes that the offense involved a semiautomatic firearm capable of accepting a large capacity magazine. But this is incorrect. The Base Offense Level should be 20. In addition, the PSR adds two levels to the guideline calculation based on the alleged possession of four firearms in the underlying offense. This, too, is incorrect. The Rule 11 reflects a factual basis that only two firearms were possessed by Wallace. When those two levels are stricken,

in addition to the Base Offense Level being adjusted to 20, Wallace's guidelines would be calculated as 46 to 57 months.

### Legal Standard Regarding Objections to the Guidelines[7]

The evidence presented to support a guidelines score must be sufficiently reliable to support the assertions. *U.S.S. g. §6A1.3* commentary. *United States v. Booze,* 108 F.3d 378 (D.C. Cir. 1997); *United States v. Morris*, 76 F.3d 171 (7th Cir. 1996). The Government bears the burden of proof with regard to factors imposed under the Sentencing Guidelines. *United States v. Cowart,* 90 F.3d 154 (6th Cir. 1996).

### Objection to the Base Offense Level

The PSR sets Defendant's Base Offense Level at 22, concluding, among other things, that that the offense involved a semiautomatic firearm capable of accepting a large capacity magazine. *See* PSR at ¶ 29; USSG §2K2.(a)(1)(B). This is incorrect. The factual basis contained in the Rule 11 Plea Agreement contains the agreed-upon facts supporting Defendant's plea of guilty. *See* Rule 11, ECF No. 45, PageID.99. In it, the parties "agree[d] that the [] facts [] accurately describe the defendant's role in the offense…" The parties agreed that Defendant possessed two handguns – an FNH,

---

[7] Defense counsel believes the government will agree with its two objections given their negotiations and the resulting Rule 11. It would also be the height of irony to argue the two defendants both possessed *all* firearms in the car when the driver, a young, white male from California, was not charged with any firearm crime.

.40 caliber firearm and a Springfield Armory XD45, .45 caliber firearm. *Id.* These handguns do not meet the definition of a "semiautomatic firearm capable of accepting a large capacity magazine." *See* PSR, para. 29; USSG §2K2.(a)(1)(B). Therefore, the Base Offense Level should be 20, which would reflect the crime committed after sustaining one felony conviction for a crime of violence. *See* USSG § 2K2.1(a)(3) and (a)(4)(A).

The firearms possessed were handguns. The guidelines are clear that these handguns possessed by Defendant do not meet the definition for a semiautomatic firearm capable of accepting a large capacity magazine, which provides: "…a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm." USSG §2K2.(a)(1)(B), commentary, n. 2. Here, the firearm did not have attached to it a magazine that could accept more than 15 rounds, leaving us only with the question of whether there was a magazine in close proximity to the firearm that could hold more than 15 rounds. There was not. A larger capacity magazine that was found under the drivers' seat was "compatible with [a] Diamondback" rifle. *See* PSR, at para. 16. Defendant did not possess the Diamondback rifle, as agreed upon by the parties, he possessed the

FNH, .40 caliber firearm and Springfield Armory XD45, .45 caliber firearm. These firearms are therefore **not** "capable of accepting" the large capacity magazine found in the vehicle.

As further evidence of not only the agreement of the parties, but also the facts of the case, the government's worksheets, for which Defendant agreed, reflect a Base Offense Level of 20, because the government, too, agreed that Defendant possessed the two handguns that had standard magazines and were not capable of accepting the high-capacity magazine found in the vehicle.

In short, the Base Offense Level is 20.

### Objection to Number of Firearms

The PSR adds two levels under USSG § 2K2.1(b)(1)(A), asserting that Defendant possessed four firearms in the underlying offense. Probation draws the legal conclusion that "defendant was seated in the rear of the Maserati where all four firearms were recovered." *See* PSR at ¶ 30. The parties' lawyers, however, concluded that Defendant possessed only two firearms – the FNH, .40 caliber firearm and Springfield Armory XD45, .45 caliber firearm. In its Rule 11 Plea Agreement, the parties "agree[d] that the [] facts [] accurately describe the defendant's role in the offense…" *See* Rule 11, *supra*. And those facts were that "[t]he firearms defendant possessed were an FNH, model FNS40C, .40 caliber firearm and a Springfield Armony XD45, .45 caliber firearm." *Id.*

Respectfully, probation should not substitute its legal judgment regarding possession for that of the lawyers in this case, particularly the prosecuting authority who is responsible for ultimately proving the charges. The parties agreed that Defendant's role in the offense was the possession of two firearms, not four. This is reflected in the parties' worksheets. It is also reflected in the government's Sentencing Memorandum where it asserts that Wallace admitted there were "two guns" in the vehicle, corroborating the fact of possessing two not four firearms. *See* ECF No. 51, PageID.316.

Accordingly, the two levels added under USSG § 2K2.1(b)(1)(A) should be stricken.

### Response to the Government Regrading Altered Serial Number and Stolen Firearms

As a threshold matter, the parties did not "miss" any two-level enhancement, as alleged by the government in its Sentencing Memorandum. *See* ECF No. 51 at PageID.331. The parties discussed by email as early as January 28, 2022 that the law does not permit the assessment of both an "altered or obliterated serial number" enhancement under USSG §2K2.1(b)(4)(B) *and* the assessment of a stolen firearm enhancement under USSG §2.1(b)(4)(A). It is one, the other – either 4 points or 2 points – or none at all. *See United States v Jones,* 620 F. App'x 434, 425 (6th Cir. 2015).

11

But on the merits, the serial numbers here are not altered or obliterated. In fact, they are legible to the naked eye in the pictures provided in the government's Sentencing Memorandum. *See* ECF No. 51, PageID.330. And "a serial number that is visible to the naked eye is not altered or obliterated." *United States v Sands*, 948 F.3d 709, 715 (6th Cir. 2020). It is telling that the government says the following in its Sentencing Memorandum:

> the Royal Oak Police were uncertain about the serial number and the ATF Special Agent had to perform a process of elimination guess work to determine the full serial number. Thus, the damage made accurate information less accessible.

*See* ECF No. 51, PageID.330. First, the government acknowledges that using the naked eye permitted ATF agents to determine the serial number. Second, the government uses the word "damage" rather than "alteration." The purpose of the enhancement is to "discourage the use of untraceable weaponry…" *Sands*, at 714. You cannot discourage conduct if it is unintentional and/or unclear as to what is punished. The photographs of the serial numbers here show potential wear and tear, as opposed to intentional conduct designed to make the serial number more difficult to read.

If law enforcement can trace a firearm's serial number with its naked eye, even if that requires a few guesses at a particular number or letter, that cannot be what *Sands* intended, as the Court explained it was looking to give a "simple,

objective standard." *Id*. By the government's own admission, the fact that law enforcement could deduce the serial number with their naked eye, the firearms meet the "naked eye test." *Id*. Does one older officer's worsening eyesight necessitate the enhancement? Of course not.

It should also not go without saying that the government's word that a police officer made a hearsay statement regarding his difficulty ascertaining the serial number is insufficient to make a finding by a preponderance of an alteration.

Defendant does not object to the stolen classification of the firearms. But the two-point enhancement should be the *only* enhancement in this regard.

## **<u>Response to the Government Regrading the Guidelines</u>**

The government concedes, rightfully, that "in fairness, the parties' Rule 11 plea agreement [and worksheets] contemplated a base offense level of 20." *See supra; see* ECF No. 51, PageID.327-328. To this end, the government also candidly admits that it anticipated guidelines, all things considered, to be 57-71 months, while probation advises a 70-87-month range. *See* ECF No. 51, PageID. 332. The government then advises the Court that it would recommend 57 months should the guidelines yield the same. *Id*.

The candor is appreciated, albeit qualified candor that still asks this Court to impose a 6-year prison sentence on the one hand, but that it would also be content with a sentence less than 5 years. For the government, this difference in the years of

a man's life hinges on this Court's interpretation of wear and tear on a firearm and other legal interpretations of possession. Frankly, if the government concedes that on these facts it finds 57 months to be acceptable, and concedes that was the parties' intention, the Court should view *that* as the bottom end of the guidelines, regardless of how it resolves the dispute. The government should have said as much instead of playing both sides.

## Sentencing

Regardless of how the Court resolves the issues above, this Court should both depart downward from the guidelines given Wallace's overstated criminal history and vary downward from the guidelines given the sentencing factors and equities.

## Downward Departure

The U.S.S.G. provides that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." §4A1.3.

Wallace's criminal history is overstated because of his youth and, along with the other reasons stated herein, Wallace's criminal history overstates "the likelihood that the defendant will commit other crimes." The PSR assigns Wallace a Category III Criminal History. The Court should consider departing from the guidelines and sentencing Wallace as a Criminal History I or II. All of Wallace's criminal history

occurred when he was 17 years old or younger. Wallace's adolescence is not accounted for by the guidelines. This discussion about adolescence applies equally to the variance request below.

"Adolescence" was not acknowledged as a stage of life until about 100 years ago. *See* **Exhibit D,** Miller v. Alabama: The Adolescent Brain and Mitigation in Criminal Sentencing, Michael F. Abramsky PhD, ABPP (hereinafter, Abramsky at (page number). It has since been defined as 13 to 19 years old and "a transitional stage of life by cognitive, emotional, and social changes which were different from both children and adults." Abramsky at Page 5. It is a period of life characterized by rapid changes, inconsistency, and inherent turmoil. *Id.* Next, science developed the ability not to just observe adolescence, but study the "functional relationship between physical structures in the brain and particular physiological and psychological functions." *Id.* at Page 7.

While there is still much unknown about the human brain, what science firmly knows about the adolescent brain is the following: the prefrontal cortex (the executive area of the brain, responsible for gathering information, synthesizing it, making judgments, and initiating action) is far from fully developed in adolescence thereby "lacking certain adult competencies"; the central nervous system's control over perception, memory, emotions, and muscles are incomplete during

adolescence; and, the amygdala (responsible for making judgments about stimuli like pleasure or pain) is not fully developed in adolescence. *Id.* at Pages 8-11.

The science, and our common sense, reminds us that adolescents "have a propensity to make decisions and take actions, which reflect immature recklessness, impulsivity, and needless risk-taking." *Id.* at 12. Indeed, "research suggests that adolescents are inherently impaired in their legal competencies when compared to adults." *Id.* at 18. Critically, it is now understood that the "rational part of a teen's brain isn't fully developed and won't be until age 25 or so."[8]

Wallace's adolescence was motherless, fatherless, abusive, burdened by physical maladies, impoverished, influenced by bad actors, and riddled with irrational decision-making. The last 8 years of Wallace's adolescence have been spent in prison or jail. Wallace has *never* had the benefit of fully maturing outside of a prison or jail environment. It is far more tragic than it is blameworthy.

As this Court is aware, not all criminal histories are the same. The U.S.S.G. criminal history introduction provides the following:

> A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the

---

[8]https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID =1&ContentID=3051; Wallace was 23 at the time of the incident here.

> likelihood of recidivism and future criminal behavior must be considered.  Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

And yet, the introduction goes on:

> While empirical research has shown that other factors are correlated highly with the likelihood of recidivism, u.g., age and drug abuse, for policy reasons **they were not included here at this time**.  The Commission has made no definitive judgment as to the reliability of the existing data.  However, the Commission will review additional data insofar as they become available in the future.

(emphasis added).

In short, the criminal history points are designed to provide just punishment for repeat offenders and protect and deter against recidivism. But the same guidelines do not account for the firm science, recognized by the Supreme Court of the United States: juveniles' have "lessened culpability" and "greater capacity for change." *Miller v Alabama,* 567 U.S. 460 (2012). Less than a year ago, this principle was re-affirmed by the Michigan Supreme Court, holding that 18-year-old cannot be sentenced to mandatory life in prison because such a sentence "fails to take into account the mitigating characteristics of youth, specifically the late-adolescent brain development." *People v Parks,* ___ Mich ___ (July 28, 2022).

Wallace's criminal history is overstated because it fails to account for his underdeveloped adolescent brain, which reflects lessened culpability and his "greater capacity for change." For these reasons, and the reasons described

elsewhere in this Memorandum, the purpose of general deterrence and the need for greater punishment are not served when punishing and deterring a physiologically different human being. Therefore, a departure is warranted because there is a lessened "likelihood that the defendant will commit other crimes." §4A1.3.

Even if the Court applies the guidelines as the PSR does, departing from a Criminal History III to a Criminal History II would change the guidelines to 63 to 78 months, and departing to a Criminal History I would change the guidelines to 57 to 71 months. Should the Court agree with Wallace that the guideline scoring is incorrect, the guidelines would be reduced to 41 to 51 months, or 37 to 46 months, respectively.

## **Downward Variance**

Wallace and his counsel have tremendous faith in this Court. So, it is only for the benefit of the record that Wallace continues to urge the importance of his adolescence in passing judgment. "Sentencing is 'an intensely human process--after all, we are dealing not with machines and equipment, but with human lives." *People v Heller,* 316 Mich App 314, 319 (2016) (quoting *United States v Davern*, 970 F.2d 1490, 1516 (6th Cir. 1992) (Jones, J., dissenting).  As the United States Supreme Court noted in *United States v Gall,* 552 US 38, 52 (2007), quoting its earlier opinion in *Koon v. United States*, 518 US 81, 113 (1996), "It has been uniform and constant ...for the sentencing judge to consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

This is, of course, a sensible proposition, since the experience of living in this world teaches us that human beings, and human lives, are multifaceted, and that a fair appraisal of any individual requires more than a one-dimensional view and a person cannot be fairly judged on the basis of only one aspect of his or her life.

Of course, in this intensely human exercise, the Court considers the sentencing factors. The Court is quite familiar with 18 U.S.C. § 3553(a), which provides that "[a] court, in determining the particular sentence to be imposed, shall consider[:]

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and,
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established. . .

(5) any pertinent policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

"[D]istrict courts have 'broad discretion to determine what sentence will serve § 3553(a)'s statutory objectives." *United States v. Kincaid*, 805 F. App'x 394, 394 (6th Cir. 2020) (quoting *United States v. Kontrol*, 554 F.3d 1089, 1093 (6th Cir. 2009)).

The Court should vary from its settled-upon guideline range because it is justified when considering all the sentencing factors on balance. As a threshold matter, this Court should know that Wallace was stopped by local police in Royal Oak, Michigan. Had Wallace been charged in state court, as opposed to grabbing the interest of federal law enforcement, Wallace's guidelines would have been 7 to 28 months with the possibility of a two-year mandatory sentence to run consecutive. Since he has already served the mandatory time, he would soon be released had this been charged in the State of Michigan.

Thus, nothing about a sentence to time served, or 36 months, would offend or undermine the sentencing factors in this case or offend justice.

First, the history and characteristics of Wallace should weigh heavily in the Court's calculus. As Dr. Abramsky wrote, having just turned 25 years old a few months ago, Wallace is *just now* exiting adolescence.[9] The life Wallace has led through his entire adolescence was something no child in this country should ever have to endure. His parents were virtually absent from his life. He was surrounded by family members – aunts, uncles, and others – who were physically and verbally abusive to both him and his brother. He was surrounded by firearms and drug dealing inside his own home. There was simply no one to offer guidance to the toddler and elementary school boy with a colostomy bag on his hip. Instead, he had to spend his time just merely surviving. What chance did he have in these years?

Second, the notion that a guideline sentence is necessary as a deterrent is misguided. No reasonable 17- or 23-year-old is going to look at the multiple years

---

[9] The government spends pages and pages of its Sentencing Memorandum attacking this young man from a broken and abusive home for having his rap contract cash on hand in his hotel room. Who was there to teach Wallace anything about what to do with money he earned? The undersigned has helped several similarly situated youths who have come into money and need help with the basics: banking, saving, insuring property, among other things. For that reason, three pages worth of pictures crassly inserted into the government's memo don't elicit contempt from the undersigned, but sympathy. Perhaps it is just being cut from a different cloth than the government's writer who sees evil, because what counsel sees is a kid with no direction walking around with a Chase Bank bag not knowing how to be an adult. Notably, the government asserts it was looking for more guns and more wrongdoing in conducting the search. They found nothing. Instead, the government attempts to tether this cash to obstruction of justice. Again, the assertion is evidence of unserious, ignorant juveniles who need mentoring and help, rather than more judgment from prosecutors.

Wallace is serving in jail, in COVID conditions, and later in prison, and think to himself or herself that crime pays. The government littered its Sentencing Memorandum with exclamation points related to Wallace's recidivism and inability to rehabilitate. It cites the petty larceny and carrying of a concealed weapon of a 14- and 15-year-old as example of a "crime spree." There is no mention of adolescence, no mention of Wallace's background, and it is wholly devoid of any humanity. The government would be better off just writing "throw him away."

Third, Wallace is a budding success story that will benefit both himself and society from being outside the prison walls than inside. This Court is familiar with other success stories. For every tragic example the government will undoubtedly cite for the media and others, there are a dozen more success stories. The success rate of compassionate release prisoners (measured by return or no return to prison) is astounding. People do change and they are most successful in changing when they a visible path to do it. Wallace has never had this opportunity before. His entire life has been a darkened room with no light, no hope. The two months he spent out of prison for the first time he was 17 is not a reflection of someone who yet experienced enough of his opportunity and the world around him to really benefit.

Fourth, a sentence of time served, or 36 months, promotes respect for the law and recognizes the seriousness of the offense. There is no doubt the offense is serious. It is self-evident that irresponsible and unlawful possession of firearms pose

a significant threat to the community. There must be consequences and there have been.[10] In fact, Wallace has served 27 months in a restrictive county jail during the continued COVID-19 lockdown. Wallace himself suffered a symptomatic COVID-19 infection while incarcerated. *See* PSR at ¶ 61. A time-served sentence, which would amount to about 27-30 months, or a sentence of 36 months, in harsher conditions than ordinary (lockdown), in a jail with more restrictions than a federal prison, promotes respect for the law, is sufficiently punitive, and, given the state guidelines, and the offense conduct, where fortunately no guns were fired and no one was hurt, reflects the seriousness of the offense.

---

[10] Defense counsel would like to point out some two issues with the government's factual background in its sentencing memorandum. First, the "white Maserati" that the government refers to several times was a rental by a bunch of kids trying to look cool. Second, it is debatable whether the headlights were on. This would have been the subject of a motion to suppress had a resolution not occurred. The government places a deceiving picture of the car's lights. Here is a different screenshot showing the lights may have been on. The Court is directed to the grass and street beside the white car being illuminated.



This Court is always permitted to consider the harshness of incarceration and whether it provided additional just punishment and deterrence. For example, because of lockdowns initiated and continued during the COVID-19 pandemic, "the punitive aspects of prison life have skyrocketed..." *United States v. Lopez,* 2020 U.S. Dist. LEXIS 106989, at 10 (S.D.N.Y. June 15, 2020). Wallace's years in a county jail, in lockdown, and his suffering COVID-19 himself, was punishment and a deterrent. One Court in this district has opined: "Had the Court known when it sentenced [Defendant] that he would be subjected to such additional restrictions while incarcerated, it may have sentenced him to a shorter term of imprisonment." *United States v. King,* 17-cr-20332, 2020 U.S. Dist. LEXIS 165451, at 15 (E.D. Mich. 2020).

On this same factor, the seriousness of the offense and the promotion of respect for the law, defense counsel would be remiss if not to point out someone is missing from the defense table – Anthony Miranda. Mr. Miranda, a white male from California, who discovery shows was likely aware of the firearms, and, at a minimum was driving with open intoxicants, was not charged here, nor does it

appear he was charged in Royal Oak or Oakland County, Michigan.[11] One handgun was under the driver's seat where Miranda sat. The fact that Mr. Miranda walked while the government asks this Court to throw Wallace and his co-defendant in prison for nearly 6 years does not promote respect the law, it promotes disparity in the law.

In 2021, the Eastern District of Michigan varied downward in 54% of firearms cases. [12] The government acknowledged the parties anticipated guidelines and indicated to this Court it would be content with a low-end guideline range of 57 months. It is from this point, based on all of the information contained herein, on balance, that Wallace belongs in the majority of firearms cases that are worthy of a departure or variance downward. His case begs for recognition of his troubled childhood and his hopeful future.

---

[11] The government writes in its sentencing memorandum that police observed "red plastic cups in the cupholder near the driver." ECF No. 51, PageID.314. From the government's memo:



[12]https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/mie21.pdf

We ask the Court sentence to time served or 36 months in prison. Wallace will still have to answer to the Michigan Parole Board thereafter – that fact will allow the discretion of the state to determine if any more time is necessary.

Date:  March 23, 2023                               Respectfully Submitted,

                                                    WADE FINK LAW P.C.

                                                    /s/ Wade G. Fink
                                                    Wade G. Fink (P78751)
                                                    Attorneys for Defendants
                                                    550 W. Merrill St., Suite 100
                                                    Birmingham, MI 48009
                                                    248-712-1054
                                                    wade@wadefinklaw.com

**PROOF OF SERVICE**

The undersigned certifies that on March 23, 2023, he filed the foregoing using the ECF e-filing system, which will send notice and a copy of this document to all parties of record.

/s/ Wade G. Fink

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                              Case No. 21-cr-20036

v.

                              Hon. Laurie J. Michelson

D-1 MARCELLUS WALLACE.

      Defendant.

---

# DEFENDANT MARCELLUS WALLACE'S
# EXHIBITS TO SENTENCING MEMORANDUM

# EXHIBIT A

February 15, 2023

The Honorable Laurie J. Michaelson
United States District Court
Eastern District of Michigan
Southern Division

Re: United States of America v. Marcellus Wallace et al. (Case No. 21-cr-20036-01)

Dear Judge Michaelson:

My name is Selim Bouab, and I am the Co-President of 300 Entertainment LLC. I have been a senior executive at 300 Entertainment since 2014. During my time at 300, I have helped advance the careers of a successful roster of Grammy-winning, Platinum-certified artists.

I consider Marcellus Wallace, professionally known as "Baby Grizzley", as one of our most notable signings in the recent years. We were excited to sign Marcellus to 300 Entertainment, and, despite his incarceration, our excitement remains intact. Marcellus has a unique ability to turn his traumatic life experiences into artistic parables that give a voice to the voiceless. His skills as an artist are enhanced by the guidance of his older brother Terry Wallace Jr., professionally known as "Tee Grizzley", one of the biggest cultural leaders in hip hop.  In addition to Terry Wallace, Marcellus has the support of myself and the entire 300 team to provide him with the tools needed to succeed in the music business and beyond.

I believe Marcellus recognizes that he made bad decisions in the past, but I also believe he understands that it is important for him to lead a positive, productive life and to take seriously his duties as a role model to others. The success of his brother serves to remind Marcellus of what can be achieved when one chooses to live a life dedicated to focusing on attaining success for oneself and community outreach activities.

My goal is to be a mentor to Marcellus, similarly to how I have mentored his brother. Terry, myself and the entire 300 team stand ready to give Marcellus our full collective support to make him a successful artist. Furthermore, Marcellus has the unique advantage of being able to use his brother's success to enhance his profile and advance his career, something everyone is excited to help actualize. I believe that, if given the chance with a reduced sentence, Marcellus could use art and philanthropic activities to show others how they can turn their life around no matter their circumstances.

On this basis, I ask your Honor, to grant Marcellus a reduced sentence.

Thank you,

Selim Bouab
Co-President
300 Entertainment LLC

# EXHIBIT B

February 15, 2023

The Honorable Laurie J. Michaelson
United States District Court
Eastern District of Michigan
Southern Division

Re: United States of America v. Marcellus Wallace et al. (Case No. 21-cr-20036-01)

Dear Judge Michaelson:

My name is Rayna Bass, and I am the Co-President of 300 Entertainment. I have worked at 300 Entertainment since 2014, and throughout my years an executive in the music industry, I have had the honor to spearhead marketing campaigns for some of the world's most influential artists.

I met Marcellus Wallace, professionally known as "Baby Grizzley," while working with his older brother Terry Wallace Jr., professionally known as "Tee Grizzley," one of the most influential storytellers in Hip Hop culture. Following Marcellus' signing with 300 Entertainment, he and his older brother, Terry, released several songs that surpassed 5 million views in such a short period of time it cemented Marcellus as the "one to watch in the coming new year" according to Hip Hop's acclaimed magazine, *Respect*.

Marcellus should not be viewed any differently than any other offender in a criminal case. However, unlike many others who may have appeared before this court, Marcellus has an opportunity to positively channel his creativity and achieve success with support and guidance from his family, community and record label. Marcellus was at the beginning of a promising career before his incarceration. His brother, Terry, and 300 remain fully committed to use all of their respective resources in the music industry to increase Marcellus' visibility as an artist, storyteller, and positive leader in his community. I believe Marcellus understands the severity of the crimes for which he has taken full responsibility, and if given the chance with a reduced sentence, he would use this opportunity to focus on a creative outlet that models redemption and positive life changes for his fans.

On this basis, I ask your Honor to grant Marcellus a reduced sentence.

Thank you,


Rayna Bass
Co-President
300 Entertainment LLC

**EXHIBIT C**

February 15, 2023

The Honorable Laurie J. Michaelson
United States District Court
Eastern District of Michigan
Southern Division

Re: United States of America v. Marcellus Wallace et al. (Case No. 21-cr-20036-01)

Dear Judge Michaelson:

My name is Kevin Liles, and I am a philanthropist, author, community activist, former President and CEO of Def Jam Records and currently the Chairman & CEO of 300Elektra Entertainment, and Head of 300 Studios. Throughout my storied career as an entertainment executive, I have had the pleasure of working with cultural heavyweights such as Jay-Z, D'Angelo, LL Cool J, Whitney Houston, Bruno Mars, Megan Thee Stallion and many more. I also remain staunch in my philanthropic, charitable, and humanitarian endeavors as a positive force for change, cultural enlightenment, and social justice. I founded both Kevin Liles For A Better Baltimore and The Make It Happen Foundation, and I sit on numerous boards. I can also be found regularly on MSNBC and CNBC speaking about the entertainment business and current events. I am humbled to have received an honorary doctorate from Morgan State University, Miles College and I am most proud of being the father of four lovely children.

I've worked with many artists over the years who were similarly situated to Mr. Wallace. He, like others other artists, grew up in an environment with concentrated poverty and had an uphill battle to achieve upward economic mobility. I have also witnessed how artists' lives are changed when given the opportunity to have a successful music career supported by a record label. This type of opportunity provides a creative outlet for individuals that encourages a productive use of their time and provides them the ability to achieve the financial freedom necessary to transition to a safer, more secure environment for them and their families. Many of these artists use their success to improve the lives of others in their communities and become valued members of society. I've personally seen individuals who, upon release from prison, create a new life for themselves and positively impact the lives of others through activism and philanthropy. The 300 team has placed the creation and release of Mr. Wallace's music as priority upon his release from incarceration, because we believe Mr. Wallace can be one of those individuals.

I firmly believe that with 300 Entertainment's assistance and the support of Mr. Wallace's family, he can rehabilitate his life and become a positive example for other young people who have gone down similarly difficult paths. I believe that Mr. Wallace understands the obligations required of him upon his release to ensure he leads a positive life in the future, and I place my support in the opportunity for his early release.

On this basis, I ask your Honor, to grant Marcellus a reduced sentence.

Thank you,

Kevin Liles
Chairman & CEO of 300Elektra Entertainment
112 Madison Avenue
New York, New York 10016

# EXHIBIT D

Running Head: *MILLER V. ALABAMA* AS SEEN THROUGH THE LENS OF
NEUROPSYCHOLOGICAL RESEARCH ON ADOLESCENTS                                    1

**Miller v. Alabama*: The Adolescent Brain and Mitigation in Criminal Sentencing*

**Michael F. Abramsky PhD, ABPP**

**Private Practice: Birmingham, Michigan**

*MILLER V. ALABAMA* AS SEEN THROUGH THE LENS OF NEUROPSYCHOLOGICAL    2
RESEARCH ON ADOLESCENTS

Abstract

Recent Supreme Court rulings have focused on sentencing issues for adolescent offenders. The outcome of these rulings has been to define adolescents as a distinct class, subject to disparate treatment in sentencing. *Miller v. Alabama* rejected state-initiated automatic life-in-prison sentences for adolescent murderers. It limited natural life sentences to only those adolescents who showed a pattern of "incorrigibility" and placed the burden of proof of incorrigibility on prosecutors. The current research paper discusses the findings on adolescent brain development and the cognitive and behavioral limitations imposed on adolescent behavior due to neuro-developmental immaturity. It then explores how *Miller v. Alabama* took these research findings and used them to establish guidelines for determining contributing parameters for sentencing of adolescents, taking into account personality variables, behavioral capacities, and situational parameters.

*Miller v. Alabama* As Seen Through the Lens of Neuropsychological Research on Adolescents

Juvenile defendants have been at the center of new rulings by the United States Supreme Court for the last two decades. Decisions related to juvenile criminal sentencing have been a primary area of focus. The legal analysis leading to alterations in sentencing due to the truncated abilities of adolescents was an indirect product of years of prior psychological research.

Graham and Roper established that children are fundamentally different than adults for sentencing purposes. Roper stated, "Their lack of maturity and underdeveloped sense of responsibility lead to recklessness impulsivity and heedless risk-taking." Adolescents are "more vulnerable…to negative influences and outside pressures from family, peers, and others that they come into contact with. They have limited control over their environment and lack the ability to extricate themselves from horrific, crime producing settings." This occurs because a child's character is not as well formed as adults – his traits are "less fixed" and his actions are less likely to be proof of "irretrievable depravity." Roper and Graham emphasized "the distinctive attributes of youth diminish the penological justification for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."

In 2005, the courts began to consider developmental psychological factors when opining on numerous cases involving crimes committed by juveniles. The courts utilized the growing literature and data on adolescent development as a foundation and justification for these rulings; this has resulted in sentencing mitigation. For example, the court abolished the death penalty for juveniles (*Roper v. Simmons, 2005)*, ruled against life without parole sentencing for non-

homicide-related juvenile crimes (*Graham v Florida,* 2010), and overturned automatic life-without-parole sentences for juveniles (*Miller v Alabama,* 2012). Furthermore, California Senate Bill 260, which passed in 2013, requires the Board of Parole Hearings to conduct a unique youth offender parole hearing for individuals who committed specific crimes before the age of 18. These hearings must take into account the diminished culpability of juveniles as compared to adults, the key features of youth, and any subsequent growth and increased maturity of the prisoner.

In *Miller v. Alabama* (2012), the court recognized adolescence as a period of time in one's life characterized by the limitations of a still-developing brain, which lacks the functional capacity of a fully formed adult brain. In doing so, law and psychology were brought into concordance on the position that the adolescent brain is not fully formed, leading to impairments in thinking, emotional regulation, and behavioral repertoire.

In all of these cases, the court acknowledged that the limited functioning of the adolescent brain should merit a careful and thoughtful consideration in sentencing. Most states, however, have fixed sentences for murder of either life in prison without parole or, in some states, the death penalty. Judges have no discretion. A jury's finding of capital murder automatically triggers a life without parole sentence. *Miller* upended that precedent, mandating that a judge be given discretion when the defendant is an adolescent. In other words, the capital crime no longer led to a fixed and automatic sentence but was open to variable sentencing parameters, due to the immature neuro-psychological status of the teenager. Sentences had to be justified through the presentation of data on the psychological status of the adolescent, which could lead to natural life or might lead to mitigation of a sentence.

*MILLER V. ALABAMA* AS SEEN THROUGH THE LENS OF NEUROPSYCHOLOGICAL          5
RESEARCH ON ADOLESCENTS

These recent advances in legal pedagogy began 100 years ago, with psychologists'

discovery of adolescence as a viable stage of life. Adolescence was not acknowledged in

agrarian economies; children reached a stage of physical maturity, at which time they were

considered adults and began working the farm or as craftsmen. As society industrialized,

prolonged formal education was needed to master the advanced skills required for business and

general functioning in society. Skills such as advanced reading, writing, accounting, and

communication became mandatory to partake in occupations that required a higher level of

cognitive processing. Educators recognized that many of these skills began developing at a

particular time in life. This coined an intermediate developmental category, "adolescence,"

which was sandwiched between childhood and adulthood. Adolescence was thought to have

unique strengths as well as deficits in respect to cognition, emotions, and behavior. It was

recognized that certain skills that could not be learned in childhood could be acquired in the

teenage years. However, those same teenagers appeared more like children in respect to much of

their emotional and social life.

American psychologist G. Stanley Hall (1931) was one of the first to study adolescence.

He defined it as a transitional stage of life characterized by cognitive, emotional, and social

changes which were different from both children and adults. Adolescence today is generally

defined within the parameters of ages 13 through 19. Hall described the state of adolescence as

one of "sturm und drang" (storm and stress) and a stage often characterized by rapid changes,

inconsistency, and inherent turmoil. Over time, the psychological community adopted a

definition of adolescence as a stage of life which began with the biological changes that initiate

puberty, incorporating secondary sexual characteristics such as pubic hair, sexual maturity, and

numerous other physical changes, and ending with social changes such as finishing high school and going to college or joining the work force.

The psychological community has continued to study the unique stage of adolescence. As a result, new tests, surveys, and instruments have been developed, allowing for measurement of skills and deficits unique to the adolescent subset of the population. There have also been changes in teaching techniques, psychological interventions, and medical treatments resulting from this ongoing field of study. The law, however, remained firmly rooted in a child/adult bifurcation.

Studying the adolescent brain became the next advance within the field. All psychological measures of cognitive development are indirect estimates of an underlying physiological process; all behavior begins with a basic physiological process or processes. Cognition has been determined to originate in the brain; therefore, changes in cognition are related to underlying changes in the brain itself. Consequently, understanding fully the changing capacities of an adolescent requires knowledge of the brain structures during this stage of life.

Through the emergence of technological advances, a number of new neurocognitive instruments have become predominant direct measures of the brain (Casey, Tottenham, Liston, & Durston, 2005). The intersection of computers and advanced instrumentation allowed researchers to directly observe brain function, mapping changes in connectivity and architecture over the life span. Functional Magnetic Resonance Imaging (fMRI) and Positron Emission Tomography (PET) studies facilitate observations of brain activity while individuals are involved in tasks such as problem-solving. These neuro-imaging measures and concepts were also applied to developmental studies; researchers began observing the brain through functional imaging techniques at various life stages, from infancy to senescence. In doing so, researchers were able

to determine that changes in brain structure are universal and inherent in adolescence. They were also able to draw correlations regarding specific patterns of strengths and limitations in cognition, emotions, and problem-solving between emerging brain development and the acquisition of skills (Amso and Casey, 2006).

Studies found a functional relationship between physical structures in the brain and particular physiological and psychological functions. For example, the occipital lobe of the brain is associated with vision. Damage to the occipital lobe may result in visual problems or problems in connectivity with other areas of the brain, leading to problems integrating and utilizing visual information.

Changes in brain architecture and connectivity during adolescence have been observed. Architecture refers to the structure of the brain into regions, such as the aforementioned occipital lobe. Over time, structures become more articulated and specialized. The brain also develops more complex neural pathways through which information is processed and communicated between structures. This process of increased connectivity makes information more nuanced, specific, and complex; it also integrates various brain functions into coordinated behavior.

The functional structures of the brain are present in their most basic form in infancy. Like the rest of the body, these structures grow in size and sophistication as a person ages. Growth and development occur at different rates and schedules between each individual structure, leading to uneven development of behavioral function. Consequently, some brain structures may have reached maturity by adolescence, while others continue to develop throughout and beyond this stage of life. Indeed, some typical behaviors of adolescence are mature and adultlike, while others may appear immature and childlike; this is a direct reflection of this plasticity and inconsistency of brain development.

*MILLER V. ALABAMA* AS SEEN THROUGH THE LENS OF NEUROPSYCHOLOGICAL
RESEARCH ON ADOLESCENTS

8

These discoveries shed new light on adolescent competencies and answer the basic question of which behaviors are possible and which are not during this stage of life. A brain structure, when it has reached full maturity, may allow for certain behaviors; similarly, a structure, which is known to continue to develop into adulthood, may reflect that certain behaviors are not yet developed.

When considering the concept of competence, the brain is the foundation. Brain capacity and structure are a necessary and sufficient foundation for the development of skills. The brain capacity tells us what is possible at any given stage. However, ultimate behavior is also "experience dependent," meaning that personal experiences, learning history, and other intrapsychic and environmental factors determine how competence is enhanced or diminished. It also affects the outward manifestations of behavior.

The literature on adolescent brain development is in its own adolescence: we know much, but there is still much unknown. However, there are some firm findings in respect to anatomical changes, connectivity, and social-emotional regulation.


**Anatomical Changes**: The prefrontal cortex is the executive area of the brain. It is the area last to develop and is unique to humans. Its primary function, like any executive, is to gather all the necessary information, synthesize it, make judgments, and initiate action. The prefrontal cortex matures in adolescence, but is not fully formed and functional in those teen years, thereby lacking certain adult competencies. The prefrontal cortex processes information from both motoric actions and cognition, and helps plan complex cognitive behaviors, personality expression, and decision-making. This process entails initiation of actions and language, problem

solving, spontaneity, memory, judgment, and impulse control; all of these processes are utilized at different levels based on the initial information gathered (Kolb and Wishaw, 1990).

The source of information is drawn from other processing areas of the brain, especially the parietal lobe; the parietal lobe's primary responsibility is sensory perception and the integration thereof. This is where information such as taste, temperature, and touch are processed.

**Connectivity**: The central nervous system in the brain is comprised of grey matter and white matter. Grey matter is implicated in sensory perception, memory, emotions, speech, and almost all muscle control. White matter is implicated in connecting grey matter units, thus integrating diverse cells into coherent networks. A process called myelination aids in the speed of transmission between cells.

The growth of white matter and development of myelination determines the capacity for greater intelligence, reading skills, visual-spatial skills, language response, inhibition, memory, planning and strategizing, and goal setting (Jetha and Segalowitz, 2012). Total myelinization is generally incomplete during adolescence, limiting connectivity and thus lowering competencies.

**Social-emotional Development**. The process of brain development is a biological programmed unfolding. However, only a portion of behavioral manifestations are a direct expression of that biological development. Most cognitive, emotional, and behavior experiences are mediated through what has happened to us in our lives. The brain determines the capacity for certain acts to occur, while actual performance is facilitated or inhibited by our life experiences. Modern psychology focuses on the combination of these physiological and psychosocial factors in the expression of behavior.

The amygdala is a structure in the limbic system of the brain that makes judgments about whether a stimulus will produce pain or pleasure. It is connected to other areas of the brain, primarily the cerebral cortex, which use that information to adaptively respond.

The common societal understanding of "stress" is actually a reflection of the amygdala and its connective network in recognizing stressful situations, which are excitatory brain states, and strategizing to mitigate or escape the perceived threats that lead to these agitated states. The specific excitatory emotions of fear and aggression are processed, stored, and activated in the amygdala. Recent research has found that the adolescent amygdala is not fully mature. The amygdala's capacity for identifying fear is more adequate by this age, but has been found to be weaker in identifying anger (Whalen et al., 2001). That is, the adolescent may not be able to fully integrate angry feelings into an adaptive behavioral repertoire. Moreover, behavioral research has shown that a personal history of abuse, "stored" in the amygdala, renders an adolescent less able to recognize or adaptively cope with anger (Pollak, Cicchetti, Hornung, Reed, 2000).

Inadequate development of the frontal lobe is reflected in deficits in social awareness, social decision-making, and the generation of abstract knowledge related to social and moral expectations (Nelson, Leibenluft, and McClure, 2005) and risk-taking (Steinberg, 2007). It cannot take the information from the amygdala, integrate it, and use it for decision-making.

The amygdala-frontal cortex axis is our main regulator in recognizing fear and aggression and dealing with it adaptively. Deficient development in both structures during adolescence make teenagers poorly equipped to act rationally in tense, stressful situations. Grisso and Kavanaugh (2016), in summarizing the research on deficits in adolescent behavior highlight that adolescents display imprudent risk-taking, are motivated by sensation or thrill-seeking, and show poor capacity for self-regulation or control. Such tendencies are dictated by brain development,

but can be worsened by social experiences; a history of socialization deficits such as a premature

termination of education, a past history of abuse and neglect (Zelechoski, 2016), or drug and

alcohol abuse. Excessive dependency on authority figures can further weaken the adolescent's

meager skills in these areas.

### Legal Implications

*Miller v. Alabama* (2012) was a seminal ruling which integrated law and developmental

neuropsychology. *Miller* opined that adolescents had membership in a defined class of the

population; imposing a sentence of life without parole on a member of that class thereby dictated

that it is the burden of the prosecutor to prove that that the defendant is not a member of that

defined class because he or she is "the rarest of juveniles" and is "permanently incorrigible" or

"irreparably corrupt." Furthermore, *Miller* established that participation in the crime itself cannot

be used to judge character. Instead, character must be established by patterns. Essentially, when

translated into psychological parlance, the courts hereby define an individual outside of this

defined class as a "psychopath" if they are shown to have a repetitive pattern of predation toward

others and a callous lack of empathy toward their victims (Hare, 1970). This definition of

psychopathy is the criterion for sentencing adolescents to life without parole based on the notion

that they lack rehabilitative potential.

*Miller* offers operational guidelines to assess "immaturity factors which may have been

operative at the time the adolescent committed the crime." *Miller* puts the onus on the

prosecution to prove "incorrigibility" through an assessment of these factors to determine the

presence of patterns. There are five (5) such criteria.

1) **Decisional Factor**. This factor calls into question the adolescent's ability to make

   rational decisions. Adolescents have a propensity to make decisions and take actions,

which reflect immature recklessness, impulsivity, and needless risk-taking (*Miller v. Alabama*, 2012). They also show less autonomy in decision-making and a greater susceptibility to peer influence when making such decisions. Steinberg, in doing his own research as well as reviewing the work of others, found that adolescents as a class tend to be impulsive, risk-taking, and rash in their decision-making capacity (Scott & Steinberg, 2003; Scott & Steinberg, 2008; Steinberg, 2004; Steinberg, 2008).

2) **Dependency factor.** *Miller* bifurcates dependency into two factors; the first refers to the meager resources an adolescent has to remove himself or herself from a dysfunctional environment. A lack of sophisticated reasoning prowess, no financial resources, no viable vocation, and an incomplete education all coincide to make the adolescent less able to "self extricate" from adverse conditions. The second factor refers to the extent of adverse conditions themselves. Abuse and neglect may have different weights, from mild to severe, and there is an assumption that the more severe the more likely to cause significant damage. "Children are more vulnerable to negative influences and outside pressures, including family and peers, they have limited control over their environment and lack the ability to extricate themselves from horrific, crime producing settings" (*Miller v. Alabama*, 2012). The court must take into consideration the cultural, home, and social/peer environment of minors. Adolescents do not have access to common institutions and societal processes to the same degree as their adult counterparts. There are institutional blocks to autonomy such as driving a vehicle, working, or voting. Minors also lack the social skills to process and handle peer and societal pressures. They are susceptible to the influence

of older and more mature individuals due to underdeveloped personalities and reasoning skills due to underdeveloped brain structures. *Miller* also recognized that instances of abuse and neglect by caretakers retard the progression of normal independence. Abuse and neglect provide a model of antisocial actions, making the child more likely to model those disruptive behaviors. The dependency factor is influenced more by socialization deficits than a lack of brain development. The end product is the inability of an adolescent to extricate themselves from dangerous situation, and increased susceptibility to anti-social influences.

The famous social-psychological experiments on social conformity conducted by Solomon Ash (1956) demonstrated that early adolescents are most susceptible to peer pressure, taking the opinion of peers over their own judgments (also see Steinberg & Monahan, 2007). Milgram (1974) demonstrated that the adolescent group they studied was most likely to "take orders" and commit violence toward another when commanded to do so. Adults showed more independence, and were more resistant.

There is a body of literature showing that the trauma incurred by children through neglect and abuse has lasting effects. Among those effects are significant anxiety, elevated fear, and conformity to the desire of others in order to escape punishment. This pattern is first established in those abusive homes and then generalized to the outside world (Wevodau, 2016; Strand, Sarmiento, & Pasquale, 2005; Zelechoski, 2016).

The trauma induced in such familial abuse is aggravated by the relative helplessness of the child whose dependency prevents extrication from their

environment. Unsurprisingly, these children are more prone to involve themselves
with older authority figures with the same dynamic of dependency.

3) **Offense Context Factor.** This factor calls for an examination of "circumstances of the
homicide offense, including the extent of his participation in the conduct and the way
familial and peer pressure may have affected him" (*Miller v. Alabama*, 2012). Entailed in
this question are the details related to the sequence of events in the crime. It requires a
look at the actions, thoughts, feelings, and character structure of the juvenile defendant:

- Was there planning involved in the crime or were the actions impulsive or
  spontaneous?
- Was the defendant the main perpetrator, an active accomplice, or an accessory
  with little direct involvement in the planning of or participation in the homicide?
- With respect to motive, how much of the juvenile defendant's behavior may have
  been the result of past abuse or peer pressure?
- Is there a history of trauma symptoms and did such symptoms result in deficits in
  self-regulation during decision-making (Ford, 2005; Ford & Blaustein, 2013)?
- Were the juvenile defendant's actions independent or influenced or commanded
  by another?
- Was the juvenile defendant vulnerable to pressure from authority figures or ego
  ideals?
- Was the juvenile defendant motivated by passion (e.g., retaliation for abuse) or
  instrumental motivations (e.g., robbery)?

- What of the character of the youth; were they excessively dependent and thus easily influenced?

- Were they in a relationship with power discrepancies based on sex differences, violent tendencies, or economic dependency?

- Was the juvenile defendant aware of, and did they consider, both the short-term and long-term consequences and their actions (Lavigne & Rybroek, 2013)?

- Was the defendant experiencing active symptomatology of mental illness at the time the crime was committed?

- Was substance abuse involved?

The Offense Context Factor entails both environmental influences and particular vulnerabilities of the juvenile defendant, which may influence either prosocial or antisocial behavior.

4) **Rehabilitative Potential Factors.** This factor incorporates the notion that "a child's character is not as well-formed as an adult's, his traits are less fixed" (*Miller v. Alabama*, 2012). Life without parole forswears altogether the rehabilitative ideal and is at odds with a child's capacity for change.

Data drawn from the general population of juvenile offenders shows that most do not continue with criminal activity into adulthood (Mulvey, et al., 2010; Monahan, Steinberg, Cauffman, &Mulvey, 2009; Moffitt, 1993). Consequently, the data strongly suggests a positive prognosis for most juvenile offenders. This data reinforces the general observation that the behavior of minors characterized by

impulsivity, recklessness, and inability to factor in long-term consequences is largely

transient. It is the unique product of a developmental stage, which has a concrete

endpoint.

Psychologists have developed a number of diagnostic instruments to predict

recidivism in youths and their likely response to rehabilitative efforts (Salekin,

Macdougall, & Harrison, 2016; Hoge & Andrews, 2010; Broom, Bartle, & Forth,

2006). Consequently, *Miller v. Alabama* has enshrined a diagnostic phase into

adolescent criminal cases wherein psychological testing is conducted to aid in

sentencing.

*Miller v. Alabama* has also opened the door for reconsideration for those prisoners

who were sentenced to life without parole as adolescents prior to the shift in the

zeitgeist regarding juvenile sentencing. Most of those prisoners have been in prison

for years. Many have extensive documentation of positive achievements and

accomplishments while incarcerated in their records. Such records can provide direct

evidence of rehabilitation. The prisoner's general behavior, history of infractions,

educational and vocational accomplishments, work history in prison, and record of

criminal activity in prison can be used as direct evidence of rehabilitative potential if

released. Similarly, "incorrigibility" as the pivotal standard in *Miller* can be

ascertained by repetitive infractions, which entail predatory behavior, violence, or

lack of empathy toward others.

5) **Legal Competency Factor.** The legal competency factor refers to errors in the legal

processing of juvenile cases. During the arrest, interrogation, and sentencing of these

minors, there is a tacit assumption that these procedures should apply equally to adolescents and adults. However, research suggests that they do not.

In order to be tried, offer a confession, or accept a plea deal, the law requires a defendant to possess a level of competence. Yet competence measures rest almost exclusively on cognitive skills such as reading, processing, and memory. Grisso's (2005) survey of competency evaluation instruments demonstrates that most competency evaluations consist of questions and answers regarding the judicial system, as well as the ability of the defendant to provide information and to aid his attorney in formulating a defense (see *Dusky v. US*, 362 U.S. 402, 1960).

General developmental research has shown most adolescents can begin to understand, explain, and reason with such principles in the early to mid-teen years (Piaget, 1969). Most are thus able to pass competency examinations. However, there is reason to doubt whether such cognitive competencies have the same weight and validity when applied to the adolescent mind.

Given the deficits noted in brain development and socialization in adolescence as compared to adulthood, it is an open question as to whether minors can integrate cognitive knowledge into informed behavior. This provides some doubt as to whether or not the adolescent can adequately reason about the future consequences of their actions, translate cognitive knowledge into realistic goal planning, and control cognitive impulses related to interrogation and confession. It also leads to speculation regarding whether peer pressure or police pressure can mitigate, create doubt, or even shape actions in ways that are not understood. In other words, adults' knowledge and

actions may work hand-in-hand; for adolescents, knowledge is not necessarily

integrated enough to use that knowledge in the service of adaptive behavior.

There is already a corpus of relevant research in this area. A comprehensive

article by Grisso and Kavanaugh (2016) summarizes these findings: "There is much

research demonstrating adolescents' lesser capacities on average compared to adults

in the context of police interrogations (e.g., Goldstein et al., 2003; Grisso, 1981;

Kassin et al., 2010), pleading and attorney collaboration (e.g., Peterson-Badali  &

Abramovitch 2005; Abramovitch, 1993; Richardson, Gudjonsson, & Kelly, 1995;

Viljoen, Klaver, & Roesch, 2005) and understanding and decision-making in the trial

process (e.g., Abramovitch, Higgins-Bliss, & Bliss, 1993; Abramovitch, Peterson-

Badali & Roha, 1995; Grisso, et al., 1993). In addition, the relevant psychological

research regarding a juvenile's competency to stand trial offers substantial evidence

for the potential effects of immaturity on the capacities of adolescents compared to

those capacities of adults.

In conclusion, research suggests that adolescents are inherently impaired in their legal

competencies when compared to adults. By inference, sentencing should reflect these

impairments. Most states have begun to modify sentencing structure for adolescents based on the

research. However, many prisoners sentenced as juveniles long ago remain in prison decades

later under the old sentencing guidelines. Consideration and application of the growing and

robust body of case law and literature is imperative in the review of these old cases in order to

better reflect our modern understanding of the adolescent.

## References

Amso, D., & Casey, B.J. *Beyond What Develops When Neuroimaging May Inform How
Cognition Changes with Development*. Current Directions in Psychological Science 15(1) 24-
29. February 2006.

Ashe, S.E. (1956). Studies of Independence and Conformity: A Minority of One against a
Unanimous Majority. Psychological Monographs: General and Applied 70(a) 1-70.

Broom, R., Bartle, P., & Forth, A. E. (2006). *SAVRY, Structured Assessment of Violence Risk in
Youth: Professional manual*. Lutz, FL: Psychological Assessment Resources.

Casey, B., Tottenham, N., Liston, C., & Durston, S. (2005). Imaging the developing brain: What
have we learned about cognitive development? *Trends in Cognitive Sciences, 9*(3), 104-110.
doi:10.1016/j.tics.2005.01.011

Ford, J. D. (2005). Treatment Implications of Altered Affect Regulation and Information
Processing Following Child Maltreatment. *Psychiatric Annals, 35*(5), 410-419.
doi:10.3928/00485713-20050501-07

Ford, J. D., & Blaustein, M. E. (2013). Systemic Self-Regulation: A Framework for Trauma-
Informed Services in Residential Juvenile Justice Programs. *Journal of Family
Violence, 28*(7), 665-677. doi:10.1007/s10896-013-9538-5

Grisso, T. (1981). *Juveniles waiver of rights: Legal and psychological competence*. New York:
Plenum Press.

Grisso, T., Broom, R., Edens, J. F., Moye, J., & Otto, R. K. (2005). *Evaluating Competencies
Forensic Assessments and Instruments*. Boston (MA): Springer.

Hare, R. D. (1970). *Psychopathy: Theory and research: Theory and research*. New York: Wiley.

Kolb, B., & Wishaw, I.Q. (1990). Fundamentals of Human Neuropsychology. W.H. Freeman

and Company. New York.

Levigne, M., & Rybroek, G.V. (2013). "He Got in My Face So I Shot Him": How Defendants

Language Impairments Impair Attorney-Client Relationships. *CUNY Law Review, 17*(01), 69.

doi:10.31641/clr170103

Milgram, S. (1965). Some Conditions of Obedience and Disobedience to Authority. *Human

Relations, 18*(1), 57-76. doi:10.1177/001872676501800105

Moffitt, T. E. (2017). Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A

Developmental Taxonomy. *Biosocial Theories of Crime,* 69-96.

doi:10.4324/9781315096278-3

Monahan, K. C., Steinberg, L., Cauffman, E., &Mulvey, E. P. (2009).Trajectories of antisocial

behavior and psychosocial maturity from adolescence to young adulthood. *Developmental

Psychology, 45*(6), 1654-1668. doi:10.1037/a0015862

Mulvey, E. P., Steinberg, L., Piquero, A. R., Besana, M., Fagan, J., Schubert, C., & Cauffman, E.

(2010). Trajectories of desistance and continuity in antisocial behavior following court

adjudication among serious adolescent offenders—CORRIGENDUM. *Development and

Psychopathology, 22*(04), 971. doi:10.1017/s095457941000057x

Piaget, J., & Inhelder, B. (1969). *The Psychology of the Child.* Basic Books.

Pollak, S., Cicchetti, D., Hornung, K.,& Reed, A. *Recognizing Emotions in Faces:

Developmental Effects of Child Abuse and Neglect.* Developmental Psychology. 2000 Vol.

36, No. 5 679-688.

Salekin, R. T., Macdougall, E. A., & Harrison, N. A. (2016). Developmental maturity and

sophistication-maturity: Learning more about its purpose and assessment. *APA Handbook of

Psychology and Juvenile Justice.,* 405-424. doi:10.1037/14643-019

Scott, E. S., & Steinberg, L. D. (2010). *Rethinking juvenile justice*. Cambridge, MA: Harvard

University Press.

Steinberg, L. (2004). Risk Taking in Adolescence: What Changes, and Why? *Annals of the New

York Academy of Sciences, 1021*(1), 51-58. doi:10.1196/annals.1308.005

Steinberg, L. (2007). Risk Taking in Adolescence. *Current Directions in Psychological

Science, 16*(2), 55-59. doi:10.1111/j.1467-8721.2007.00475.x

Steinberg, L. (2013). The influence of neuroscience on US Supreme Court decisions about

adolescents' criminal culpability. *Nature Reviews Neuroscience, 14*(7), 513-518.

doi:10.1038/nrn3509

Steinberg, L. (2017). A social neuroscience perspective on adolescent risk-taking. *Biosocial

Theories of Crime,* 435-463. doi:10.4324/9781315096278-19

Steinberg, L., & Monahan, K.C. (2007). Age differences in resistance to peer influence.

*Developmental Psychology, 43,* 1531-1543.

Steinberg, L., & Scott, E. S. (2003). Less Guilty by Reason of Adolescence: Developmental

Immaturity, Diminished Responsibility, and the Juvenile Death Penalty. *American

Psychologist, 58*(12), 1009-1018. doi:10.1037/0003-066x.58.12.1009

Strand, V. C., Sarmiento, T. L., & Pasquale, L. E. (2005). Assessment and Screening Tools for

Trauma in Children and Adolescents. *Trauma, Violence, & Abuse, 6*(1), 55-78.

doi:10.1177/1524838004272559

Wevodau, A. (2016). Review of trauma screening tools for children and adolescents. Retrieved

from http://www.nysap.us/Products.html.

Whalen, P., Shin, L.M., McInerney, S.C., Fischer, H., Wright, C.L., & Rauch, S.L. *A Functional

Study of Human Amygdala Responses to Facial Expressions of Fear Versus Anger.* Emotion,

2001 Vol. 1 No. 1, 70-81.

Zelechoski, A. (2016). Trauma, adverse experience, and offending. In K. Heilbrun, D. DeMatteo,

& N. Goldstein (Eds.), *APA handbook of psychology and juvenile justice* (pp. 325–342).

Washington, DC: American Psychological Association. http://dx.doi.org/10.1037/14643-015


------


*Graham v. Florida*, 130 S. Ct 2011 (2010).

*Roper v. Simmons*, 125 S. Ct. 1183 (2005).

*Miller v. Alabama*, 132 S. Ct. 2455 (2012).

*People v. Skinner*, WI.4945986 (Mich. Ct. App. Aug. 20, 2015).

Lerner, R.M., & Steinberg, L. Handbook of Adolescence. Vol. 1-2. Wiley, 3rd Edition. New

York, 2009.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders*

(5th ed.). Washington, DC: Author.

DeMatteo, D., Wolbransky, M., & LaDuke, C. (2016). Risk assessment with juveniles. In K.

Heilbrun, D. DeMatteo, & N. E. S. Goldstein (Eds.), *APA handbooks in psychology series.

APA handbook of psychology and juvenile justice* (pp. 365-384). Washington, DC, US:

American Psychological Association. http://dx.doi.org/10.1037/14643-017

Greenwood, P. (2006). *Changing lives: Delinquency prevention and crime-control policy.*

Chicago, IL: University of Chicago Press.

Grisso, T. (2006). Adolescents' decision making: A developmental perspective on constitutional

provisions in delinquency cases. *New England Journal on Criminal and Civil Confinement,
32,* 3-14.

Grisso, T. (2013). *Forensic evaluation of juveniles* (2nd ed.). Sarasota, FL: Professional Resource

Press.

Kruh, I., & Grisso, T. (2009). Evaluation of juveniles' competence to stand trial. New York, NY:

Oxford.

Piquero, A., & Moffitt, T., (2014). Moffitt's developmental taxonomy of antisocial behavior. In

G. Bruinsman & D. Weisburd (Eds.), *Encyclopedia of criminology and criminal justice* (pp.

3121-3127). New York, NY: Springer. http://dx.doi.org/10.1007/978-1-4614-5690-2_506

Salekin, R. (2004). *Risk-Sophistication-Treatment Inventory.* Lutz, FL: Psychological

Assessment Resources.